EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Manuel R. ("Manny") Suárez,  et al.<br><br>    Demandantes–Peticionarios<br><br>                v.<br><br>Comisión Estatal de Elecciones, et al.<br><br>       Demandados–Recurridos | Certificación<br><br>2004 TSPR 208<br><br> 163 DPR _____ |

Número del Caso: CT-2004-4

Fecha: 23 de diciembre de 2004

Tribunal de Primera Instancia
Sala Superior de San Juan


Abogada de la Parte Peticionaria:

                Lcda. María Soledad Piñeiro Soler

Abogados de la Parte Recurrida:

                Lcdo. Pedro Delgado
                Lcdo. Luis F. Estrella Martínez
                Lcdo. Gerardo de Jesús Annoni
                Lcdo. Juan Dalmau
                Lcdo. Thomas Rivera Schatz
                Lcdo. Pedro E. Ortiz Álvarez
                Lcda. Gina R. Méndez Miró
                Lcda. Johanna M. Emmanuelli Huertas
                Lcdo. José A. Carlo Rodríguez
                Lcdo. José E. Meléndez Ortiz, Jr.
                Lcdo. Alberto Rodríguez Ramos
                Lcdo. Alfredo Acevedo Cruz

Materia: Solicitud de Certificación de Recurso ante el Tribunal de
        Primera Instancia, Sala de San Juan


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Manuel R. ("Manny") Suárez,
*et al.*

    Demandantes-Peticionarios

        Vs.             CT-2004-004     Certificación

Comisión Estatal de Elecciones,
*et al.*

    Demandados-Recurridos

PER CURIAM

San Juan, Puerto Rico, a 23 de diciembre de 2004.

El pasado 20 de noviembre de 2004, resolvimos, a través del mecanismo de <u>sentencia declaratoria</u>, que era válido aquel voto emitido en la papeleta estatal que contenía una cruz bajo una de las insignias de los partidos y una cruz en cada uno de los encasillados correspondientes a los candidatos a los puestos de Gobernador y de Comisionado Residente pertenecientes a otros partidos políticos. Véase, <u>Manuel R. ("Manny") Suárez v. Comisión Estatal de Elecciones</u>, Op. del 20 de noviembre de 2004, 2004 TSPR 179. Al así hacerlo, destacamos sobre todo lo siguiente:

Primero, es un hecho incuestionable que el intérprete final de las leyes del Estado Libre Asociado de Puerto Rico es el Tribunal Supremo de Puerto Rico. Ese poder de actuar como último intérprete, se extiende, claro está, a las leyes electorales. P.S.P. v. Comisión Estatal de Elecciones II, 110 D.P.R. 538 (1980).

Segundo, ante cualquier posible vaguedad o laguna en las disposiciones estatutarias o reglamentarias que regulan el ejercicio del voto, la interpretación adoptada debe dar primacía a la máxima protección de la expresión electoral. PPD v. Barreto, 111 D.P.R. 199, 260 (1981). *Véanse*, *además*, Granados Navedo v. Rodríguez Estrada I, 123 D.P.R. 1 (1988); PNP v. Rodríguez Estrada, 123 D.P.R. 1 (1988); Santos v. CEE, 111 D.P.R. 351 (1981); PSP v. CEE, 110 D.P.R. 400 (1980). Se garantiza así el derecho al voto del elector.

Tercero, el esquema electoral puertorriqueño establece normas y mecanismos uniformes para adjudicar los votos tanto en la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977, 16 L.P.R.A. sec. 301 *et seq*. (en adelante Ley Electoral de Puerto Rico) como en el Reglamento para las Elecciones Generales y el Escrutinio General de 2004 aprobado el 2 de julio de 2004.

Cuarto, el tipo de voto impugnado en las elecciones generales de 2004, entiéndase, aquel voto emitido en la papeleta estatal que contiene una cruz bajo una de las

insignias de los partidos y una cruz en cada uno de los encasillados correspondientes a los candidatos a los puestos de Gobernador y de Comisionado Residente pertenecientes a otros partidos políticos, es válido por ser perfectamente coherente con el esquema estatutario y reglamentario que regula el proceso electoral de Puerto Rico.

De conformidad con lo anterior, y por tratarse de una controversia en la que está involucrado el derecho fundamental al sufragio a la luz de un ordenamiento totalmente puertorriqueño, al expedir el auto de certificación y revocar la sentencia recurrida ordenamos que se contaran y adjudicaran como válidas todas las papeletas marcadas por los electores de la forma impugnada. Además, ordenamos que se comenzara el recuento electoral.

En este punto, es menester señalar que la validez del Reglamento para las Elecciones Generales y el Escrutinio General de 2004, aprobado al amparo de la Ley Electoral de Puerto Rico, el cual contiene las disposiciones relativas a la adjudicación del voto mixto, no fue impugnada —-**ni en la C.E.E., ni en los tribunales**-- por ningún candidato a puesto electivo, partido político o sus Comisionados Electorales. Todo lo contrario, a través de sus Comisionados Electorales, los partidos políticos participaron activamente en la aprobación del referido Reglamento y mostraron su conformidad con el mismo. Por

ende, consideramos que cualquier ataque a la validez del Reglamento, por una de las partes que participó activamente en su aprobación, era tardío.

No empece lo antes dicho, y luego de haber solicitado una prórroga al término concedido para comparecer, el Comisionado Electoral del Partido Nuevo Progresista mediante una solicitud de "removal" defectuosa, intentó privar a este Tribunal de jurisdicción para entender en el asunto.[1] Luego de un extenso proceso ante la Corte de

---

[1] Entre otras razones, nuestra decisión en Suárez v. Comisión Estatal de Elecciones, *supra,* estuvo enmarcada en lo resuelto por la Corte de Apelaciones de los Estados Unidos para el Primer Circuito en Berberian v. Gibney, 514 F. 2d. 792-793 (1er. Cir. 1975). Dicho caso deja claramente establecido que hasta tanto no se complete el procedimiento de *"removal"* ambas cortes, la estatal y la federal, conservan jurisdicción para resolver las controversias ante su consideración. ("[j]urisdiction of federal court attaches as soon as petition for removal from state court is filed; both state and federal courts have jurisdiction until process of removal is completed.").

De hecho, del expediente en autos claramente se desprende que la notificación de traslado le fue notificada únicamente al Lcdo. Manuel Suárez, demandante; a la Lcda. Maria Soledad Piñeiro, abogada del Lcdo. Manuel Suárez, al Lcdo. Pedro Ortiz Álvarez, abogado del P.P.D.; y al Lcdo. Pedro Delgado Hernández, abogado del Presidente de la C.E.E. En lo pertinente, la certificación de notificación reza de la siguiente manera:

CERTIFICAMOS que durante el dia de hoy se notificará copia fiel y exacta de este escrito por fax a los abogados de récord de las demás partes: **Lcda. Maria Soledad Piñeiro,** (787)758-4236; **Lcdo. Pedro Ortiz Álvarez,** (787)841-0000; **Lcdo. Manuel Suárez,** (787) 977-3312, y **Lcdo. Pedro Delgado Hernández,** (787)753-8944.

**Es decir, el Comisionado Electoral del P.I.P., Lcdo. Juan Dalmau, aun cuando era parte en el pleito, no fue notificado de la petición de "removal" al momento que ésta**

Distrito de los Estados Unidos para el Distrito de Puerto Rico, el pasado 15 de diciembre de 2004 la Corte de Apelaciones de los Estados Unidos para el Primer Circuito revocó las órdenes de la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico por considerar que ese foro había incurrido en un claro abuso de discreción al emitir éstas y determinó, cónsono con nuestro criterio, que el foro con jurisdicción para entender en controversias como las de autos, donde está involucrada la interpretación de leyes estatales, es el Tribunal Supremo de Puerto Rico. *Véase*, Rosselló González v. Calderón Serra, Civil No. 04-2610 (1er. Cir., 2004).

Enterados de la orden emitida por la Corte de Apelaciones de los Estados Unidos para el Primer Circuito, en aras de eliminar la inseguridad, intranquilidad y desasosiego que reina entre los ciudadanos puertorriqueños que se preocupan justificadamente por la integridad del voto depositado por cada elector, este Tribunal **reitera** los pronunciamientos validos emitidos en Manuel R. ("Manny") Suárez v. Comisión Estatal de Elecciones, *supra.*

Por consiguiente, a los fines de garantizar que el recuento ordenado por este Tribunal se complete lo antes posible, se ordena a la Secretaria del Tribunal que remita el mandato inmediatamente. De esta manera, aseguramos que,

---

**fue presentada ante este Tribunal**. La falta de dicha notificación impide que la petición de "removal" quede perfeccionada. Véase, 28 U.S.C.A. §1446(d).

a los fines de emitir prontamente los certificados de elección, la C.E.E. pueda concluir con la adjudicación de los votos. A su vez, propiciamos que el  nuevo Gobernador pueda tomar posesión en la fecha que dispone nuestra Constitución, entiéndase, el 2 de enero de 2005. *Véase*, Constitución del Estado Libre Asociado de Puerto Rico, Art. IV, Sec. 2, 1 L.P.R.A.

Se dictará la Sentencia correspondiente.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Manuel R. ("Manny") Suárez,
*et al.*

    Demandantes-Peticionarios

        Vs.               CT-2004-004        Certificación

Comisión Estatal de Elecciones,
*et al.*

    Demandados-Recurridos

SENTENCIA

San Juan, Puerto Rico, a 23 de diciembre de 2004.

Por los fundamentos expuestos en la Opinión Per Curiam que antecede la cual se hace formar parte integral de la presente, este Tribunal **reitera** los pronunciamientos válidos emitidos en Manuel R. ("Manny") Suárez v. Comisión Estatal de Elecciones, Op. 20 de noviembre de 2004, 2004 TSPR 179, donde declaramos válido aquel voto emitido en la papeleta estatal que contenía una cruz bajo una de las insignias de los partidos y una cruz en cada uno de los encasillados correspondientes a los candidatos a los puestos de Gobernador y de Comisionado Residente pertenecientes a otros partidos políticos.

Por consiguiente, con el propósito de garantizar que el recuento ordenado por este Tribunal se complete lo antes posible, se ordena a la Secretaria del Tribunal que remita el mandato correspondiente inmediatamente.

Notifíquese por teléfono, por telefax, personalmente, y por la vía ordinaria a todas las partes.

CT-2004-004                                                    2


        Así lo pronunció y manda el Tribunal y certifica la
Secretaria del Tribunal Supremo. Los Jueces Asociados señor
Rebollo López, señor Corrada del Río y señor Rivera Pérez
emitieron Opiniones Disidentes.



                    Aida I. Oquendo Graulau
                  Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Manuel R. Suárez Jiménez
y otros

    Peticionarios

      vs.                     CT-2004-004       CERTIFICACIÓN

Comisión Estatal de Elecciones
y otros

    Recurridos

OPINIÓN DISIDENTE EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 23 de diciembre de 2004

La algarabía que causó en Puerto Rico la decisión emitida el 15 de diciembre de 2004 por la Corte Federal de Apelaciones para el Primer Circuito, ha tenido la consecuencia de que haya pasado <u>desapercibido</u> el hecho de que el referido foro apelativo federal determinó que la Opinión y Sentencia mayoritaria que este Tribunal emitiera el 20 de noviembre de 2004 <u>es "nula"</u>.

Al así resolver, la Corte Federal de Apelaciones del Primer Circuito expresó, en el escolio 22 de la página 12 de la Opinión que emitiera, que:

> We _agree_ with the District Court that The Supreme Court's judgment _was void_. The governing statute provides that the filing of "a copy of the notice (of removal) with the clerk of (the) State court . . . effect(s) the removal and _the State court shall proceed no further_ unless and until the case is remanded." 28 U.S.C. § 1446(d) (emphasis added). The Supreme Court received notice of the removal at 11:48 a.m. on November 20, 2004 but did not issue judgment until that evening. _The judgment is thus, as the District Court found, a nullity_. (énfasis suplido).

Estamos en _completo acuerdo_ con dicha determinación. En la Opinión disidente que emitimos el 30 de noviembre de 2004 así, claramente, lo hicimos constar en el Acápite IV de la misma. En aquél entonces, adujimos en apoyo de dicha determinación, fundamentalmente, las mismas razones que expresara en su decisión la Corte Federal de Apelaciones para el Primer Circuito. Hicimos constar, _además_, en nuestra Opinión disidente que este Tribunal había actuado, _sin jurisdicción_, ya que _no_ había "caso o controversia", esto es, el caso _no_ era "justiciable"; ello en vista del hecho de que la decisión de la Comisión Estatal de Elecciones que se pretendía revisar _había advenido final y firme_. La Mayoría, naturalmente, _también hizo caso omiso de este señalamiento, el cual, igualmente, es jurídicamente correcto_.

En el día de hoy --y al regresar a este Tribunal el caso que había sido objeto de la solicitud de remoción, en cumplimiento de la decisión emitida por la Corte Federal de Apelaciones para el Primer Circuito-- una mayoría de los integrantes del Tribunal se empeña en asumir jurisdicción en este caso. Ante esta acción, _la cual obviamente no compartimos_, somos del criterio que están obligados a _re-emitir_ la Opinión y Sentencia que erróneamente emitieron el 20 de noviembre de 2004, _acción necesaria e_

imprescindible que debe ser tomada por la Mayoría en vista de la nulidad absoluta de que adolece la referida Opinión y Sentencia.[2]

Debe quedar claro que no estamos expresando que la decisión emitida por este Tribunal es nula por razón de que así lo hubieran concluido tres Jueces de este Tribunal y/o tres Jueces del Tribunal Federal de Apelaciones del Primer Circuito.[3] Dicha decisión es nula *ab initio* por mandato expreso de la Sección 1446(d) de la 28 U.S.C.; estatuto federal que, gústenos o no, aplica a Puerto Rico.

I

Asumiendo --únicamente a los fines de la argumentación-- que este Tribunal tiene jurisdicción en el presente caso, ¿por qué es necesario que este Tribunal, re-emita la decisión que emitió en el presente caso el pasado 20 de noviembre de 2004?

Como es sabido, las decisiones finales que emite este Tribunal son revisables, únicamente, por el Tribunal Supremo de los Estados Unidos. 28 U.S.C.A. sec. 1258. Véase: Artículo 42 de la Ley de Relaciones Federales con Puerto Rico, 1 L.P.R.A. sec. 42, 48 U.S.C.A. sec. 864; Pan American Computer Corp. v. Data General Corp., 112 D.P.R. 780, 794 (1982). Al haber este Tribunal, por decisión mayoritaria, asumido erróneamente jurisdicción en el caso y emitir una decisión al respecto, la parte codemandada

---

[2] En un obvio intento por ignorar esta situación, y en lugar de re-emitir su decisión, la Mayoría se envuelve en un ejercicio, o discusión, teórica, el cual, realmente, no amerita ser refutado.

[3] La razón es sencilla: nuestro criterio es uno minoritario, que no obliga al Tribunal, y nuestras decisiones no son revisables por el Tribunal Federal de Apelaciones, razón por la cual sus determinaciones no son obligatorias para este Tribunal.

perjudicada por la misma puede optar por acudir, en revisión de la misma, ante el Tribunal Supremo federal.

Si la decisión emitida por este Tribunal, como hemos visto, es completamente nula, cabe preguntarse: ¿cómo puede apelarse una decisión que es nula, esto es, que es inexistente?; ¿cuál es la fecha cierta a partir de la cual comienza a contarse para radicar ese recurso?; ¿existe esa fecha?

Como es de todos conocidos una actuación nula es inexistente, por lo que no genera consecuencias jurídicas. Dicho de otro modo, "... lo nulo nunca tuvo eficacia alguna, nunca nació en derecho, nunca existió". Brown III v. Junta de Directores Cond. Playa Grande, res. el 6 de junio de 2001, 2001 T.S.P.R. 80; Montañez Rivera v. Policía de P.R., res. el 3 de mayo de 2000, 2000 T.S.P.R. 68.

En Ríos v. Municipio de Isabela, res. el 15 de julio de 2003, 2003 T.S.P.R. 122, atendimos una controversia en torno a la validez de ciertos actos nulos realizados por el Municipio de Isabela. Allí, y citando con aprobación a Brown v. Junta, ante, fuimos enfáticos al señalar que "lo inexistente nunca puede ser convalidado [...] ni siquiera mediante la aprobación de una resolución municipal". (énfasis suplido).[4]

---

[4] A manera de analogía, señalamos lo que se ha dicho en el campo de la contratación, a los efectos de que "...el contrato afectado de nulidad radical o absoluta, como no existe, no puede ser confirmado. De suerte que, como dice Puig Brutau, lo único que cabe en el caso del contrato radicalmente nulo es volverlo a celebrar, produciendo únicamente efectos desde su válida celebración". José Puig Brutau, Fundamentos de Derecho Civil, Tomo

Siendo ello así --con completa certeza y corrección jurídica-- se puede argumentar: 1) que este Tribunal viene en la obligación de re-emitir la Opinión y Sentencia que erróneamente emitiera el 20 de noviembre de 2004 ya que la misma no puede ser objeto de ratificación o convalidación; y 2) que el término para "revisar" la Opinión y Sentencia emitida por la Mayoría el 20 de noviembre de 2004 nunca ha comenzado a decursar; ello porque dicha ponencia es inexistente y nunca "nació en derecho", y ciertamente no procede ni tan siquiera hablar de término para revisar algo que nunca ocurrió desde un punto de vista jurídico.

Es por ello que somos del criterio que el Tribunal no puede meramente limitarse a reiterar la decisión que emitiera el 20 de noviembre de 2004, expresando que "...reitera los pronunciamiento válidos emitidos en Manuel R. ("Manny") Suárez v. Comisión Estatal de Elecciones, Op. del 20 de noviembre de 2004, CT-2004-004", (énfasis suplido y en el original); lo cual, a todas luces, no sólo es erróneo, sino trágico y lastimoso.[5]

---

II, Vol. I, Editorial Bosch, 1978, pág. 327 en José Ramón Velez Torres, Curso de Derecho Civil, Tomo IV, Vol. II, Revista Jurídica U.I.P.R., 1990, a la pág. 131.

---

[5] La única posible explicación para la extraña y errónea actitud que asume la mayoría del Tribunal es que no quieren aceptar, o admitir, que cometieron un serio y grave error al certificar la Opinión y Sentencia de 20 de noviembre de 2004. Dicha actitud ciertamente no es beneficiosa para el sistema judicial puertorriqueño ya que no constituye un buen ejemplo para los demás tribunales de este País. Debemos recordar que el aceptar que hemos incurrido en error, es índice de humildad y nobleza.

Como expresáramos anteriormente lo nulo es sencillamente inexistente y no puede ser convalidado. Brown v. Junta, ante; Ríos v. Municipio, ante. En vista de ello, el único curso decisorio al alcance de la Mayoría, era y es, re-emitir la referida decisión ya que los pronunciamiento contenidos en la misma no pueden ser considerados válidos debido a que la decisión es nula. De así no hacerlo, somos de la opinión que el Tribunal no sólo incumple de manera crasa con sus obligaciones y responsabilidades, sino que está privando y/o poniendo en riesgo de privar a una parte de su derecho a revisar las decisiones que emite este Foro, esto es, lamentablemente incurre en una violación del debido proceso de ley.

Como no podemos, ni queremos, ser partícipes de una acción de esa naturaleza, y para salvar nuestra responsabilidad con esta Institución, es que nos expresamos hoy mediante Opinión disidente a esos efectos.


                                    II

No queremos terminar sin hacer referencia a la gran ironía que permea toda esta situación: como expresáramos en la Opinión disidente que emitiéramos el 30 de noviembre de 2004, el Presidente de la Comisión Estatal de Elecciones  --Lcdo. Aurelio Gracia-- resolvió que el voto mixto en controversia, el llamado "pivazo", era válido y que debía ser contado no sólo para los candidatos a Gobernador y Comisionado Residente del Partido Popular Democrático, sino también para el Partido Independentista Puertorriqueño, para efectos de inscripción del mismo, decisión que advino final y firme.

Ello significa, como resulta obvio, que la decisión que emitió este Tribunal el 20 de noviembre de 2004 --<u>sin jurisdicción, a destiempo y nula</u>-- no sólo no tiene efecto jurídico alguno en nuestra jurisdicción sino que era totalmente innecesaria. Inalterada la situación jurídica al presente, la Opinión Per Curiam hoy emitida por la Mayoría resulta, igualmente, improcedente en derecho.


                    FRANCISCO REBOLLO LÓPEZ
                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Manuel R. ("Manny") Suárez
Jiménez y Otros

    Peticionarios

       v.                                CT-2004-4    Certificación

Comisión Estatal de Elecciones
y Otros

     Recurridos


Opinión Disidente emitida por el Juez Asociado SEÑOR CORRADA DEL RÍO


San Juan, Puerto Rico, a 23 de diciembre de 2004.

La mayoría de este Tribunal ha emitido una Opinión *Per Curiam* en la que, en síntesis, ratifica la Opinión *Per Curiam* emitida el 20 de noviembre de 2004.

En respuesta a esa Opinión mayoritaria de 20 de noviembre, emitimos una de nuestra parte expresando nuestro disenso por, entre otras razones, entender que no estaban presentes los requisitos que, según la ley, han de ser satisfechos para que proceda el recurso de Certificación solicitado, y por entender que no estábamos ante un caso o controversia justiciable según los criterios establecidos por la

jurisprudencia de este Tribunal, y del Tribunal Supremo de los Estados Unidos. *Véase: Suárez Jiménez v. Comisión Estatal de Elecciones*, 2004 J.T.S. 187.

El curso procesal que ha seguido el presente recurso, con posterioridad al 30 de noviembre de 2004, fecha en que emitimos nuestra Opinión disidente, ha constituido un serio agravante para la posición que en aquel entonces asumió la mayoría y que hoy reiteran. A esos efectos, la mayoría sostiene que estamos ante un caso o controversia justiciable, que existe legitimación activa de parte de los demandantes, y que se cumple con los requisitos necesarios para emitir una sentencia declaratoria.

Este recurso hoy se encuentra aún más distante de satisfacer los requisitos de legitimación activa, y de caso o controversia justiciable, de lo que se encontraba al momento en que se emitió la primera Opinión de la mayoría el 20 de noviembre de 2004. Dado el hecho de que los votos en controversia han sido contados y adjudicados según el reclamo de la parte demandante, tenemos que preguntarnos entonces: ¿Cuál es el remedio que estamos concediendo? ¿Cuál es la controversia existente?

I.

Dada la nulidad de la sentencia de este Tribunal de 20 de noviembre de 2004, y tomando en consideración que hoy se reiteran sus fundamentos, nos vemos precisados a reiterar lo expuesto en nuestro disenso anterior. Resulta útil esbozar, en apretada síntesis, el trasfondo procesal que ha precedido el recurso ante nuestra consideración. El Comisionado electoral del Partido Nuevo Progresista (P.N.P.) impugnó la validez de ciertos votos (conocidos comúnmente como "pivazos") ante la Comisión Estatal de Elecciones

(C.E.E.), organismo que ostenta jurisdicción primaria para atender y adjudicar asuntos sobre materia electoral. La Comisión adjudicó la controversia ante sí, determinando que un voto bajo la insignia del Partido Independentista Puertorriqueño (P.I.P.) y votos por el candidato a gobernador, así como el candidato a Comisionado Residente del Partido Popular Democrático (P.P.D.) en la papeleta estatal, constituía un voto mixto válido y que como tal, procedía ser adjudicado.

Sobre ese mismo asunto, los peticionarios ante nos acudieron ante el Tribunal de Primera Instancia (T.P.I.) solicitando, entre otras cosas, que se emitiera una sentencia declaratoria a los efectos de que el voto mixto bajo la insignia del P.I.P. y los candidatos del P.P.D. licenciado Aníbal Acevedo Vilá y licenciado Roberto Prats, son válidos. Ante dicha solicitud, el T.P.I. determinó que el pleito no era uno justiciable, toda vez que el 12 de noviembre de 2004 el presidente de la CEE determinó que las papeletas en controversia constituían un voto mixto válido y que procedía que se adjudicaran como tal. A la fecha de hoy dicho dictamen es final y firme. Determinó el tribunal de instancia que de entrar a discutir los méritos del caso, estaría emitiendo una opinión consultiva. A tono con lo anterior, el T.P.I. se negó a interceder en el recurso por las razones que ya hemos expuesto. Por lo cual, el resultado neto de tal determinación fue mantener en efecto la Resolución emitida por la C.E.E..

Inconforme con dicho dictamen, el 18 de noviembre de 2004, la parte peticionaria presentó ante nos recurso de certificación, mediante el cual solicitó que se emita sentencia declaratoria reiterando que los llamados "pivazos" son votos mixtos válidos y que deben ser adjudicados durante el escrutinio general.

Posteriormente, la mayoría concedió a las partes recurridas hasta el medio día del 20 de noviembre para que se expresaran. Así las cosas, a las 11:48 de la mañana del día 20 de noviembre de 2004, se presentó una notificación de traslado ("Notice of Removal") al amparo de la sección 1146(d) del Título 28 de U.S.C.. No obstante lo anterior, y en abierta contravención al referido estatuto federal el cual impone una paralización automática de los procedimientos ante el Tribunal estatal, en horas de la noche del sábado 20 de noviembre de 2004, la mayoría de este Tribunal expidió el auto de certificación y resolvió que los referidos votos ante su consideración eran válidos y deberían adjudicarse como tal.

Por su parte, el 23 de noviembre de 2004, el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico emitió una opinión en la que determinó que la acción tomada por el Tribunal Supremo de Puerto Rico, adjudicando la validez de los votos mixtos, era nula *ab initio* por haber ido en total contravención a lo establecido en el estatuto que regula el procedimiento del traslado [removal]. El Tribunal de Distrito Federal ordenó además que se identificaran y contaran todas las papeletas conteniendo los mencionados votos mixtos, que se

separaran de las demás papeletas, y que no se adjudicaran a favor de ningún candidato.

El candidato a la gobernación por el P.P.D., licenciado Aníbal Acevedo Vilá, acudió ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, apelando la decisión del Tribunal de Distrito Federal en la que se ordenó no adjudicar los votos de las papeletas mixtas con tres marcas. Solicitó además de ese Tribunal, via recurso de mandamus, que se ordenara al Tribunal de Distrito Federal enviar el caso nuevamente al Tribunal Supremo de Puerto Rico.

Así las cosas, el 15 de diciembre de 2004, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito emitió su Opinión disponiendo de la controversia ante sí. El mencionado foro sostuvo la determinación del Tribunal de Distrito Federal en cuanto a la nulidad de la determinación tomada por la mayoría de este Tribunal, por haber actuado contrario a lo establecido en el estatuto que regula el procedimiento de traslado [removal]. Véase: Pedro J. Rosselló González v. Sila M. Calderón Serra, Res. de 15 de diciembre de 2004, Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, págs. 11-12; nota al calce número 22.

No obstante, dicho foro apelativo dejó sin efecto la orden del Tribunal de Distrito Federal en cuanto a la no adjudicación de los votos mixtos de tres marcas, y ordenó a éste desestimar con perjuicio todas las reclamaciones pertinentes al asunto de las papeletas de tres marcas. Ese foro apelativo declaró además no ha

lugar la petición de *mandamus*, por entender que no era necesario emitir dicha orden toda vez que el Tribunal de Distrito Federal no tenía otra opción que enviar el recurso de vuelta al Tribunal Supremo de Puerto Rico. Acto seguido, la C.E.E. comenzó a adjudicar los mencionados votos de tres marcas ("pivazos") según lo solicitado por la parte demandante en el caso ente nos.

El 21 de diciembre de 2004, el candidato a la gobernación por el P.N.P., doctor Pedro Rosselló González, solicitó una reconsideración *"en banc"* de la decisión emitida por el panel de jueces del Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. Al día siguiente, a esa solicitud de reconsideración, el mencionado Tribunal de Apelaciones concedió no ha lugar. Por otro lado, el 21 de diciembre de 2004, el Tribunal de Distrito Federal emitió una orden devolviendo [remand] el recurso al Tribunal Supremo de Puerto Rico.

## II.

De entrada, debemos recalcar que nos reafirmamos en nuestra posición asumida en nuestro disenso anterior, de manera que disentimos de la Opinión de la mayoría de este Tribunal por entender que no estamos ante un caso o controversia justiciable, y que expresarnos sobre los méritos del asunto ante nuestra consideración constituye a todas luces una opinión consultiva. Uno de los principios básicos de nuestro derecho constitucional expone que para que un Tribunal pueda adjudicar un asunto, la controversia

ventilada ante su consideración debe tratarse de una justiciable. A esos fines, hemos establecido reiteradamente que "los tribunales debemos ser celosos guardianes de nuestra jurisdicción, estando obligados, incluso, a considerar dicho asunto *motu proprio"*. *Sánchez v. Secretario de Justicia*, Res. el 28 de junio de 2002, 2002 T.S.P.R. 98. Nuestra autoridad para analizar aspectos relacionados con la justiciabilidad de los pleitos, si ficticios, académicos o colusorios, deriva "del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen un interés real de obtener un remedio que haya de afectar sus relaciones jurídicas". *ELA v. Aguayo,* 80 D.P.R. 552; *Hernández Torres v. Gobernador*, 129 D.P.R. 824; *Sánchez v. Secretario de Justicia*, *supra*. Hemos establecido además, que "esta limitación al Poder Judicial, que emerge de la constitución y/o la jurisprudencia, nace de una doble realidad: en que los tribunales sólo pueden decidir controversias dentro de un contexto adversativo, capaz de resolver por medio de un proceso judicial; y de la división tripartita de Gobierno republicano, que asegura que la rama judicial no intervendrá en áreas sometidas al criterio de otros poderes de gobierno". *Sánchez v. Secretario de Justicia*, *supra; Noriega v. Hernández Colón*, 135 D.P.R. 406 (1995).

La jurisprudencia reitera que "un asunto no es justiciable, cuando: se trata de resolver una cuestión política; cuando una de las partes no tiene capacidad jurídica para promover el pleito;

CT-04-004

cuando después de comenzado el pleito, hechos posteriores lo convierten en académico; cuando las partes buscan obtener una 'opinión consultiva', cuando se promueve un pleito que no está maduro". *Noriega v. Hernández Colón*, *supra*.

Más aún, en *Ortiz v. Panel F.E.I.*, establecimos que:

> El concepto de opinión consultiva, que es de estirpe constitucional, se define como la ponencia legal emitida por un tribunal cuando no tiene ante sí un caso o una controversia justiciable, y cuyo resultado, por tanto, no es obligatorio. *Black's Law Dictionary*, pág. 1119 (7ma edición 1999). La doctrina de opinión consultiva es integral al concepto constitucional de '*justiciabilidad*' que rige en nuestra jurisdicción, el cual establece como requisito la existencia de un caso o controversia real para el ejercicio válido del poder judicial.
>
> La doctrina de opinión consultiva intenta evitar que se produzcan decisiones en el vacío, en el abstracto, o bajo hipótesis de índole especulativa ya que no es función de los tribunales actuar como asesores o consejeros. *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 721 (1980); *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558-560 (1958). En fin, a los tribunales les está vedado emitir opiniones consultivas sujetas a revisión e interpretación por las otras ramas de gobierno. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Vol. I, pág. 116 (1986). *Ortiz Rivera v. Panel F. E. I.*, Res. del 8 de octubre de 2001, 2001 T.S.P.R. 134.

Nos reafirmamos, como lo establecimos anteriormente en *Sánchez v. Secretario de Justicia, supra,* en que "[a]partarnos de esta norma, firmemente desarrollada y férreamente arraigada en nuestra jurisprudencia, es caer irremediablemente en pronunciamientos abstractos, especulativos, y consultivos".

De otra parte, la sentencia declaratoria, remedio solicitado por la parte compareciente, ha sido definida como "un mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra el promovente". *Charana v. Pueblo*, 109 D.P.R. 641, 653 (1980). Añadimos además en *Moscoso v. Rivera*, 76 D.P.R. 481 (1954), que "el ejercicio de esa facultad no es ilimitado y conlleva el uso de una balanceada discreción del Tribunal dentro de ciertas fronteras, contornos y postulados jurídicos". Ante esto, debemos recordar que tan recientemente como en el año 2002, fuimos sumamente enfáticos en establecer que "la legitimación activa de quien pretende utilizar dicho mecanismo [sentencia declaratoria] se rige por los mismos parámetros y normas de la doctrina de legitimación activa: la existencia de un creíble daño real no imaginario o hipotético. No es meritorio poner en marcha la maquinaria judicial en busca de un remedio cuando no existe tal daño". *Sánchez v. Secretario de Justicia*, *supra*. De manera que, para que el Tribunal pueda emitir una sentencia declaratoria es menester aplicar la doctrina de legitimación activa. Ésta establece que "[e]l promovente de una acción debe demostrar que: (1) ha sufrido un daño claro y palpable; (2) el referido daño es real, inmediato y preciso y no abstracto o hipotético; (3) existe conexión entre el daño sufrido y la causa de acción ejercitada, y (4) la causa de acción surge bajo el palio de la Constitución o de una ley". *Col. Peritos Elec. v. A.E.E.*, 150

D.P.R. 327, 331. Según lo anterior, para ostentar legitimación activa, no basta con satisfacer algunos de estos requisitos, sino que por el contrario, es necesario cumplir con todos ellos.

En ese mismo caso, *Sánchez v. Secretario de Justicia*, *supra*, citamos con aprobación a *Steffel v. Thompson*, 415 U.S. 452, (1973), donde el Tribunal Supremo de los Estados Unidos determinó que "es esencial establecer una controversia justiciable bajo la ley de sentencias declaratorias". La manera particularmente laxa en que la mayoría aplica el mecanismo de la sentencia declaratoria en el caso ante nuestra consideración, contrasta drásticamente de la posición que con tanta firmeza asumimos en *Sánchez v. Secretario de Justicia*, *supra*. Esto sin duda crea una crasa inconsistencia en las Opiniones emitidas por este Tribunal, y creará confusión ante la comunidad jurídica de nuestro país, pues adolece de falta de claridad y uniformidad en la aplicación de dicho mecanismo. Ante este precedente establecido por la mayoría, será tarea difícil para los abogados del país determinar qué recursos pueden ser objeto de la aplicación del mecanismo de la sentencia declaratoria, pues sin duda, luego de la determinación en este caso, los criterios para la aplicación de dicho mecanismo han sido distorsionados.

Ante lo requerido por la doctrina antes expuesta, forzoso es concluir que la parte que comparece ante nos, no satisface los requisitos necesarios para adquirir legitimación activa. Dado que el organismo con jurisdicción primaria para intervenir en el asunto, adjudicó la controversia a favor de la parte que hoy

comparece ante nos, que los votos están siendo adjudicados en forma exacta a lo solicitado por la parte demandante, y que al momento en que suscribimos esta Opinión ya han sido escrutados y adjudicados en exceso del noventa por ciento de la totalidad de los votos, no logramos entender cuál es el daño sufrido por la parte peticionaria. Ausente un fallo en su contra, tampoco podemos atisbar a base de qué, éstos pudieran reclamar legitimación activa.

Como indicáramos en nuestra disidencia anterior sobre este mismo asunto, resulta extraño e inusitado que este Tribunal insista en expresarse sobre los méritos del asunto ante nuestra consideración cuando no se satisfacen de manera alguna los requisitos de legitimación activa, ni de caso o controversia justiciable, y que tal acción constituye a todas luces una opinión consultiva. Por otra parte, el Tribunal llega a unas conclusiones sobre el alegado voto mixto (los llamados "pivazos") sin que ante nos exista un récord con prueba adecuada sobre esta materia para aplicar el derecho, ni para examinar serias cuestiones legales y constitucionales implicadas en este asunto. En todo caso, un curso más apropiado hubiera sido devolver el caso al Tribunal de Instancia para que celebre las vistas correspondientes que le permitan formular las conclusiones de hecho y de derecho pertinentes. Este es otro ejemplo de un activismo judicial que hace daño a nuestra forma democrática de vida.

A pesar de que en esta Opinión no pretendíamos adentrarnos en la discusión del asunto relacionado al traslado [removal] por

entender que a esta etapa no había necesidad de ello, nos hemos visto precisados a hacer lo propio para corregir las expresiones que hace la mayoría a esos fines, y para poner dentro de su real contexto el caso que citan con aprobación, *Berberian v. Gibney*, 514 F.2d 790 (1975).

La mayoría señala que fundamenta su posición con respecto al traslado en la siguiente cita de *Berberian v. Gibney, supra*;

> "[j]urisdiction of federal court attaches as soon as petition for removal from state court is filed; both state and federal courts have jurisdiction until process of removal is completed."

En el ejercicio de nuestro deber de veracidad judicial, pondremos dentro de su real contexto y significado el caso antes mencionado. Veamos. La relación del trámite procesal que se dio en *Berberian v. Gribney, supra*, fue la siguiente; la parte demandada presentó una solicitud de traslado [*removal*] ante el tribunal federal, y no ante el tribunal estatal; seis días más tarde el tribunal estatal emitió su decisión sobre el caso en controversia, y dos días después de haberse emitido esa decisión, el tribunal estatal fue finalmente notificado de la solicitud de traslado [*notice of removal*] presentada ante el tribunal federal. Es decir, la decisión del tribunal estatal fue emitida luego de haberse presentado la solicitud de traslado ante el tribunal federal, pero antes de que se hubiera notificado al tribunal estatal sobre dicha solicitud.

Por esta razón es que el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito establece que ambos tribunales tienen jurisdicción. Es decir, hasta que no se notifique al tribunal estatal, ambos tribunales tienen jurisdicción. En fin, lo que claramente establece el citado caso es que el procedimiento de traslado [*removal*] se entiende completado una vez se notifica al tribunal estatal sobre la solicitud de traslado presentada ante el tribunal federal.

En el caso ante nos, el aviso de traslado [*notice of removal*] fue presentado ante este Tribunal antes de emitirse la Opinión de 20 de noviembre de 2004.

Por estar en desacuerdo con la decisión mayoritaria, disentimos.


BALTASAR CORRADA DEL RÍO
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Manuel R. ("Manny") Suárez Jiménez; Enid Abreu Zurianga; José A. Álvarez Febles; Liany Fernández Toledo<br>      Peticionarios | | |
| v. | | |
| Comisión Estatal de Elecciones; Aurelio Gracia, Presidente; Thomas Rivera Schatz, Comisionado Electoral PNP; Juan Dalmau, Comisionado Electoral PIP; Gerardo Cruz, Comisionado Electoral del PPD; Partido Nuevo Progresista; Pedro Roselló González<br>     Recurridos | CT-04-004 | Solicitud de Certificación |

OPINIÓN DISIDENTE EMITIDA POR EL JUEZ ASOCIADO SEÑOR RIVERA PEREZ.

San Juan, Puerto Rico, a 23 de diciembre de 2004.

La Mayoría expidió el auto de certificación intrajurisdiccional solicitado, asumió jurisdicción en este asunto y certificó Opinión Per Curiam y Sentencia el 20 de noviembre de 2004, en horas de la noche.

La parte peticionaria señaló como errores cometidos por el Tribunal de Primera Instancia lo siguiente:

1. Erró el Honorable Tribunal de Primera Instancia, Sala Superior de San Juan al desestimar el caso de epígrafe aduciendo que el mismo no era justiciable.

2. Erró el Honorable Tribunal de Primera Instancia, Sala Superior de San Juan al no conceder

> remedios provisionales para garantizar los votos de los electores que votaron en las elecciones del 2 de noviembre de 2004 como los de epígrafe.

La parte peticionaria no incluyó, en ese momento, en nuestro expediente **copia de una sentencia escrita, emitida por el Tribunal de Primera Instancia ni copia de los emplazamientos diligenciados sobre las personas de todos los demandados de autos, aquí recurridos.**

El 20 de noviembre de 2004 el presente caso fue trasladado al Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico mediante un "Notice of Removal", a tenor con lo dispuesto en 28 U.S.C.A. sec. 1446(d). El 21 de diciembre de 2004 fue devuelto por ese foro a este Tribunal por orden emitida por el honorable Daniel Domínguez, Juez.

La Mayoría se reafirma en lo actuado previamente de expedir el referido auto de certificación, de asumir jurisdicción en este asunto y certifica nuevamente una Opinión Per Curiam y Sentencia en el día de hoy 23 de diciembre de 2004 en horas de la mañana. Por ese motivo reformulamos nuestra previa expresión individual y **DISENTIMOS** nuevamente del criterio mayoritario. Somos del criterio que no procede la remisión inmediata del mandato a la Comisión Estatal de Elecciones de Puerto Rico. Al actuar de esa forma la Mayoría lesiona seriamente el derecho de la parte recurrida a acudir al Tribunal Supremo de Estados Unidos de

aquellos asuntos eminentemente federales que están inmersos en este caso.

I

El viernes, 19 de noviembre de 2004 la Mayoría le concedió a los recurridos ante nos, hasta las tres de la tarde (3:00 p.m.), escasamente tres (3) horas, para expresarse sobre la "Solicitud de Certificación y Moción de Remedios Urgentes en Auxilio de Jurisdicción", presentada bajo juramento por los peticionarios ante este Tribunal el jueves, 18 de noviembre de 2004 a la una y cincuenta y siete de la tarde (1:57 p.m.) y recibida por el que subscribe a las tres y veinte de la tarde (3:20 p.m.).[6] En dicho escrito la parte peticionaria certificó cursar copia del mismo a las demás partes por correo ordinario y al Tribunal de Primera Instancia por entrega personal ese mismo día, 18 de noviembre de 2004.[7] El 19 de noviembre de 2004 a las dos y treinta y nueve minutos de la tarde (2:39 p.m.) el Comisionado Electoral del Partido Nuevo Progresista solicitó una prorroga para expresarse sobre el recurso de certificación solicitado ante nos. Arguyó que no contaba con copia del recurso de certificación. Que se le notificó copia de la Orden de este Tribunal pero no se le proveyó copia del referido

---

[6] Ese día 19 de noviembre de 2004 el sistema electrónico de investigación jurídica que tenemos disponibles los Jueces Asociados en nuestra oficinas no estaba funcionando.

[7] El próximo día viernes, 19 de noviembre de 2004 era día feriado.

CT-04-004

recurso.  El abogado del Comisionado Electoral del Partido Nuevo Progresista alegó haber estado participando activa y extensamente asesorando a su cliente durante el día feriado, viernes 19 de noviembre de 2004, en los asuntos relacionados con el proceso de escrutinio en San Juan.  Por ello, alegó, que la preparación del escrito para comparecer ante este Tribunal y expresarse se complicó aún más.  Solicitó hasta el próximo lunes 22 de noviembre de 2004 a las cinco de la tarde (5:00 p.m) para presentar su escrito.  El 19 de noviembre de 2004 a las tres y treinta y nueve de la tarde (3:39 p.m.) el Presidente de la Comisión Estatal de Elecciones presentó moción de prórroga para expresarse sobre el referido recurso.  Solicitó hasta el sábado 20 de noviembre de 2004 a las tres de la tarde (3:00 p.m.) para comparecer por escrito.  Arguyó que a las tres de la tarde (3:00 p.m.) del viernes 19 de noviembre de 2004 el honorable Aurelio Gracia estaba testificando en la vista  evidenciaria que se está celebrando ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico, y por ende le resultaba imposible cumplir con el término original pautado por este Tribunal (3:00 p.m. del día feriado, viernes 19 de noviembre de 2004).  La Mayoría le concedió una prórroga hasta las doce del medio día (12:00 p.m.) del sábado 20 de noviembre de 2004 a la Comisión Estatal de Elecciones y al Comisionado Electoral del Partido Nuevo Progresista para expresarse por escrito.[8]

---

[8] Disentimos de tal curso de acción; expresamos que le hubiéramos

Algunas de las partes demandadas de autos y aquí recurridas, durante el trámite que se estaba realizando en este tribunal los días viernes 19 y sábado 20 de noviembre de 2004, se encontraban participando activamente en los procedimientos en los asuntos relacionados con el proceso de escrutinio en San Juan y en una vista evidenciaria pautada para los mismos días y hora en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico, Sala del honorable Daniel Domínguez, Juez. Concluimos que dadas las circunstancias presentes los términos concedidos a las partes recurridas para comparecer ante este Tribunal fueron irrazonables e insuficientes para que esas partes pudieran expresarse en forma informada y responsable a este Tribunal. La Mayoría actuó en forma atropellante con esas partes. El derecho constitucional a un debido proceso de ley no es una mera formalidad. Es una garantía real y tiene que protegerse en forma efectiva. La Mayoría revocó al Tribunal de Primera Instancia que, según afirmó, desestimó la demanda de autos, sin contar con copia escrita de la sentencia emitida por ese tribunal

---

concedido al Comisionado Electoral del Partido Nuevo Progresista hasta el lunes 22 de noviembre de 2004 a las cinco de la tarde (5:00 p.m.). La moción de prorroga del Presidente de la Comisión Estatal de Elecciones se nos entregó después de certificada la Resolución de la Mayoría concediéndole a ambos hasta el sábado 20 de noviembre de 2004 a las doce del mediodía (12:00 m.). No pudimos evaluarla antes a los efectos de emitir nuestro criterio sobre la misma. Nos enteramos de que se había certificado tal Resolución, y de la existencia de la referida moción del Presidente de la Comisión Estatal de Elecciones por los medios de comunicación que difundieron una conferencia de prensa ofrecida por uno de los miembros de este Tribunal.

para evaluar los fundamentos que lo llevaron a concluir sobre la desestimación de la demanda de autos. No devolvió el caso al foro primario para el inicio de los procedimientos de primera instancia y la eventual celebración de una vista evidenciaria. Evaluó los méritos de lo planteado por los demandantes de autos al tribunal a quo y no, lo que era procedente, la decisión recurrida de desestimar la demanda. Actuó sin contar con un récord, ni con la presentación por la parte demandante de prueba admitida por el Tribunal de Primera Instancia, para sostener sus alegaciones.[9]

---

[9] Es imprescindible y necesario destacar un asunto que es de gran importancia, relevante a lo actuado por la Mayoría, señalado por el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico en su orden del 21 de diciembre de 2004 y es lo siguiente:

> The Court further notes that while this case was under the interim removal jurisdiction of this Court, the movant/removal party requested the court to receive evidence as to potentially serious collusive irregularities. The Court determined that for jurisdictional matter purposes, the issue was premature and the court did not deem to be appropriate, for purely jurisdictional purposes, to receive evidence as to substantive collusiveness. The Court was moved to receive evidence that one of the Plaintiffs failed to register a three "X" vote as corroborated by official documents of the Commission from the electoral unit wherein the voter signed to have voted. (No such vote existed in the electoral unit). Further, another voter acting as Plaintiff was not even registered to vote and failed to appear in any list of additional hand registered voters.

> If confirmed, these are serious irregularities of parties playing "fast and loose" with the Court, occurring during the interim jurisdiction of this court, which

Concluimos que todo este curso de acción tomado por la Mayoría resulta improcedente como cuestión de derecho y es crasamente violatorio a la garantía de los recurridos a un debido proceso de ley, al amparo de la Constitución de los Estados Unidos y de Puerto Rico.

El 19 de noviembre de 2004 a las cuatro y treinta y nueve de la tarde (4:39 p.m.) el Comisionado Electoral del Partido Popular Democrático presentó ante nos escrito titulado "Comparecencia del Comisionado Electoral del Partido Popular Democrático".[10] Dicha parte alega que **los demandantes de autos han sido víctimas de argumentos frívolos e injustificados que contradicen principios básicos del derecho electoral puertorriqueño. Afirma que las comparecencias en la Corte Federal en el caso federal núm. 04-2251**

warrant potentially severe sanctions against the party to be implemented by the offended jurisdiction, that is, the Supreme Court, the District Court has been determined not to have any removal jurisdiction.

Esta situación amerita que este Tribunal ordene la realización de una investigación sobre la posibilidad de abuso de los procedimientos en el presente caso, de la comisión del delito de perjurio de determinadas partes y de violación de la Regla 9 de Procedimiento Civil de Puerto Rico y de los Cánones de Ética Profesional por parte de abogados que comparecieron ante el Tribunal de Primera Instancia y ante este Tribunal.

[10] Copia de dicho documento se nos entregó el 20 de noviembre de 2004 a las nueve y cuarenta y tres minutos de la mañana (9:43 a.m.). La premura, urgencia y celeridad a que fue sometido este proceso por la Mayoría no se aplicó a la entrega de copia de ese documento a éste Juez el día 20 de noviembre de 2004 que estuvo en su oficina hasta horas de la noche, y disponible en su residencia posteriormente para atender cualquier asunto relacionado, en vista de la urgencia impartida.

CT-04-004

**(DRD) así lo demuestran.** Dicha parte expresa, en su escrito lo

siguiente:

Los demandantes federales reconocen que la CEE, la entidad que el Estado Libre Asociado ha investido con el poder de interpretar e implementar la ley electoral, **ha resuelto que esos votos son y serán contados como votos mixtos, bajo la Ley electoral de Puerto Rico, puesto que reflejan la intención del votante de votar por el PIP para propósitos de la inscripción del partido y, a su vez, votar por los candidatos del PPD para las posiciones de Gobernador y Comisionado.** Los demandantes federales, sin embargo, argumentan que la interpretación que la Comisión ha hecho de la ley y de sus reglamentos es incorrecta, y urgen a la corte a que adopte la interpretación que ellos proponen, que resultaría en la anulación de miles de votos y tendría como consecuencia práctica el haberle negado el derecho al voto a los electores que confiaron en la ley, los reglamentos y los anuncios emitidos por la Comisión sobre cómo votar mixto.

El fundamento de su posición de que estos votos son nulos es exclusivamente su propia interpretación sobre la ley y los reglamentos electorales. Al solicitarle al tribunal federal que adopte su interpretación, los demandantes federales pretenden circunvalar la autoridad de este foro para interpretar la ley local, específicamente qué derechos son los que tienen los electores en Puerto Rico bajo la ley electoral puertorriqueña.

Durante el primer día de vista en el tribunal federal, el testigo presentado por los demandantes en el caso federal ha testificado que los llamados "pivazos" son nulos y que, de su faz, no pueden ser contados. Este testimonio, aunque carente de fundamento en el Reglamento y en la Ley electoral, se presentó como el testimonio de un "experto" debido a su experiencia, a pesar de que el testigo admitió que nunca había visto este tipo de votos antes de estas elecciones. Todo el testimonio giró en torno a la interpretación de este testigo individual sobre qué es lo que dicen la ley y el reglamento electorales, función que le corresponde a las cortes del Estado Libre Asociado de Puerto Rico. Más grave aún es que el tribunal federal ha permitido, por estar ventilándose un entredicho provisional, múltiple prueba de referencia al admitir testimonio de este

testigo a los efectos de que a él supervisores no identificados, a quienes otro supervisor que había recibido información de personas que fungieron como funcionarios de colegio, le indicaron que en el escrutinio efectuado en los colegios electorales la noche de las elecciones esos votos se contaron de maneras distintas, unos como votos íntegros para PIP, otros como votos íntegros para el PPD, y otros como votos mixtos.

...

En este momento la Corte de los Estados Unidos para el Distrito de Puerto Rico está ejerciendo jurisdicción en un caso en el que se plantean cuestiones similares y en el que se insiste en que sea ese tribunal el que interprete normas básicas de nuestro ordenamiento electoral. Más aún, se pide que ejerza la función de fiscalizar y supervisar nuestro proceso electoral. Una situación similar surgió en las elecciones del 1980 ante la intervención de la Corte de los Estados Unidos para el Distrito de Puerto Rico sobre asuntos del derecho electoral puertorriqueño. (Énfasis suplido).

El 20 de noviembre de 2004 a las once y cuarenta de la mañana (11:40 a.m.) el Presidente de la Comisión Estatal de Elecciones presentó escrito ante nos titulado "Comparecencia en Cumplimiento de Orden". Expresa, en su escrito, lo siguiente:

. . .

**2. En lo esencial, adoptamos por referencia el trasfondo procesal y fáctico que exponen los peticionarios en el recurso. Los peticionarios son electores que votaron en las elecciones generales del 2 de noviembre de 2004. Expresan haber votado bajo la insignia del PIP y por las candidaturas del Lcdo. Aníbal Acevedo y del Lcdo. Roberto Prats. La CEE reconoce dicho voto como un voto mixto, una categoría de voto reconocida en el ordenamiento.[11]**

---

[11] A esos fines, véanse el Artículo 1.033(33) de la Ley Electoral; las Reglas 50, 78 y 81 del "Reglamento para las Elecciones Generales y el Escrutinio General de 2004", y las Secciones 58 y 59.2 del "Manual de Procedimientos, Elecciones Generales de 2004".

**Así lo expresó la CEE mediante Resolución** (<u>Apéndice</u>, pág. 38). Luego de las elecciones generales, en ausencia de consenso entre los Comisionados Electorales, la CEE procedió con el escrutinio general;[12] en este momento, lo está llevando a cabo conforme a la ley.

**3. Entretanto, se presentó un pleito ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico, Civil No. 04-2251 (DRD) (<u>Apéndice del recurso</u>, pág. 11). Incluimos con esta comparecencia, copia del escrito que sometimos en dicho caso (<u>Apéndice</u>, pág. 1). Adoptamos por referencia lo allí expuesto. Ayer en la tarde, el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico expidió una Orden, que acompañamos (<u>Apéndice</u>, pág. 60).**

**4. Con este trasfondo, le corresponde a esta Alta Superioridad evaluar las comparecencias y proceder conforme a derecho.** El derecho al sufragio es fundamental. La CEE así lo reconoce. Para asegurar uniformidad de adjudicación en las papeletas, existen un

---

Los demandantes en el pleito en trámite en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico, parecen haber adoptado la teoría de que el voto de los peticionarios en el caso de epígrafe es nulo, porque no aparece ilustrado en alguno de los ejemplos incluidos en dicho manual. Los ejemplos son sólo eso, "ejemplos". No operan como "numerus clausus", y menos tratándose del sufragio. Para que así fuera, debía de así expresarse en, al menos, el manual y el reglamento, por no decir en la ley en sí.

[12] En el pleito federal, los demandantes alegan que la CEE incidió al no efectuar el escrutinio general simultáneamente con un recuento según dispone la Regla 118 (8) del Reglamento para las Elecciones Generales. Han expresado que la CEE debió de actuar a base de <u>P.P.D.</u> v. <u>Barreto Pérez</u>, 110 D.P.R. 376 (1980). **Sin embargo, que sepamos, el Comisionado Electoral del Partido Nuevo Progresista no acudió en revisión ante el Tribunal de Primera Instancia, según se provee en el Artículo 1.016 de la Ley Electoral.** Por otro lado, dichos demandantes pasan por alto que en <u>P.P.D.</u> v. <u>Barreto Pérez</u> hubo consenso entre los comisionados electorales, y el hecho de que al menos cuando no existe consenso, un reglamento electoral en conflicto con el estatuto no puede prevalecer. <u>Cf</u>. López Feliciano v. Melecio, KPE 00-2255 (904), confirmado en KLCE 2000-1076. El Artículo 6.011 de la Ley Electoral el claro al requerir un escrutinio general como paso previo a un recuento. (Énfasis suplido).

CT-04-004

estatuto y un reglamento. Para asistir, a los funcionarios electorales (de los partidos políticos, quienes trabajan los centros y mesas de votación y de escrutinio) preparó y distribuyó un manual. Cumple con los criterios estatutarios y constitucionales aplicables. No debe privarse de protección a los electores que votaron, ejerciendo su derecho, de manera mixta. (Énfasis suplido).

El 20 de noviembre de 2004 a las once y cuarenta y tres de la mañana (11:43 a.m.) el Comisionado Electoral del Partido Popular Democrático presentó ante nos escrito titulado "Moción para Suplementar Comparecencia del Comisionado Electoral del Partido Popular Democrático". Expresa dicha parte, en su escrito, lo siguiente:

> Los electores demandantes emitieron un voto, siguiendo los reglamentos y los anuncios presentados por la CEE en la prensa (ver Anejo 2, pág. 2, "cómo votar mixto"). El tribunal de instancia desestimó el caso sobre la premisa de que los electores demandantes no han sufrido daño alguno porque la CEE ya determinó que va a adjudicar sus votos. **El tribunal, sin embargo, no pareció considerar la demanda federal radicada por varios electores del PNP, en la que cuestionan el derecho de los electores demandantes en este caso a expresar su intención electoral con las marcas que hicieron en sus papeletas.** De una lectura de las alegaciones de la demanda y de los documentos sometidos en ese caso, resulta evidente que la médula de la controversia es la adjudicación de los votos mixtos que contienen tres marcas. **Es la intención de los demandantes federales que el tribunal federal declare esos votos nulos, lo que equivale a una impugnación en el tribunal de los votos de los electores demandantes en este caso. Esa impugnación –aunque en el tribunal federal– requiere que a esos electores se les permita defender su voto.** Ver <u>PPD v Barreto</u>, 111 DPR 199 (1981), Granados Navedo v. Rodríguez Estrada, 127 DPR 1 (1990).[13] **Es oportunidad no la tienen**

---

[13] Aunque estos casos tratan sobre la impugnación de un voto ilegal, o sea cuando se alega que el elector no tenía derecho al voto, es evidente que cuando un elector si tiene derecho al voto, su

CT-04-004

**los demandantes en el foro federal, que ha negado la intervención de ellos en ese proceso. Por consiguiente, si este foro no revoca la decisión del tribunal de instancia y expide la certificación, a los demandantes y todos los otros miles electores efectuaron ese tipo de voto se les habrán negado *de facto* los derechos que la Ley electoral les garantiza.** Este Foro ha reconocido ya, en Salas Soler v. Secretario de Agricultura, 102 DPR 716 (1974) que cuando un estatuto expresamente dispone que se autoriza a un ciudadano a acudir a los tribunales para hacer valer los principios fundamentales contenidos en ese estatuto, la doctrina apunta hacia la apertura y liberalización del acceso a los tribunales. Bajo esta doctrina, erró el tribunal de instancia al cerrar sus puertas a los demandantes cuyos votos están en evidente peligro de ser anulados por un tribunal federal.

Durante la tarde de ayer, la Corte de Distrito dictó una Orden disponiendo la apertura de **todos** los maletines de votación y la segregación de los votos mixtos en disputa, supuestamente en aras de evaluar si debe o no dicho foro asumir jurisdicción. Ver Anejo 1. Sin duda, el Foro federal se prepara para, de tratarse de un número sustancial de papeletas, hacer una determinación sobre la validez del voto en cuestión a tenor con las disposiciones de **nuestra Ley Electoral.** Es menester resaltar que a tenor con la Orden en cuestión, el Foro Federal intervendrá en este asunto **sólo** sí su dictamen dispondría del resultado electoral. En otras palabras, la Corte de Distrito ha ignorado el mandato del Primer Circuito a los efectos de que:

> [A] federal court may not inject itself into the midst of every local electoral dispute. Election law, **as it pertains to state and local elections, is for the most part a preserve that lies within the exclusive competence of the state courts. . . . .** Thus, with only a few narrow and well-defined exceptions, federal courts are not authorized to meddle in local elections. Consequently, they normally may not authorized to meddle in local elections. Consequently, they normally may not superintend the step-by-step conduct of local electoral contests or undertake the

---

derecho tiene que garantizarse aún más y, por lo tanto, tiene que tener alguna manera para defender ese voto en los tribunales.

CT-04-004

> regulation of "garden-variety election
> irregularities."
> Bonas v. Town of North Smithfield, 265 F.
> 3d 69, 74 (1st Cir. 2001) (citando a Griffin v.
> Burns, 570 F.2d 1065, 1076 (1st Cir, 1978))
> (Énfasis nuestro).

Evidentemente, la Orden del Foro Federal tiene el efecto de detener el escrutinio general de actas y de su faz, crea un grave riesgo de irregularidades ya que dispone la apertura de **todos** los maletines (los cueles exceden 7,000), en un término de 48 horas (sábado y domingo) sin hacer un inventario completo y **sustrayendo** un número indeterminado de papeletas.

En adición de crear las dificultades antes mencionadas, la Corte de Distrito, sin tener el asunto ante su consideración, ordenó expresamente la paralización indefinida de cualquier certificación final de un ganador en la contienda para la gobernación.

> **Respetuosamente entendemos que sólo una determinación oportuna por parte de este Ilustrado Foro, en torno a la validez de los votos en cuestión habrá de detener las serias disrupciones antes mencionadas.** (Énfasis suplido).

El 20 de noviembre de 2004 el Comisionado Electoral del Partido Nuevo Progresista presentó a las once y cuarenta y ocho de la mañana (11:48 a.m.) "Notificación de Traslado" del presente caso al Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico, a tenor con la sección 1446(d) del titulo 28 U.S.C.A. Acompañó dicho escrito con documento presentado ante el foro primario federal titulado "Notice of Removal".[14]

**El 20 de noviembre de 2004 a las doce y treinta y tres del medio día (12:33 m.) compareció ante nos la co-demandante de autos**

---

[14] El caso fue devuelto por el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico a este Tribunal el día 21 de diciembre de 2004.

**y aquí peticionaria, señora Marta Font, mediante escrito titulado "Moción de la parte Interventora en Cumplimiento de Orden".** Adoptó como suyos los argumentos del co-demandante, licenciado Manuel ("Manny") Suárez Jiménez y del co-demandado de autos y aquí recurrido Comisionado Electoral del Partido Popular Democrático. Expresó, en su escrito, lo siguiente:

. . .

4. De entrada, resaltamos el hecho de que en el caso federal **Rosselló et al v. Sila Calderón**, et al, Civil 2004-2251 (DRD), no hay un solo elector como parte que votó como votaron los demandantes en este caso. **La compareciente le informa a esta Curia que por lo menos en cuanto a ella se refiere, ella rehúsa comparecer ante ese foro porque como independista, no le reconoce jurisdicción en Puerto Rico. De hecho, se solicita que se tome conocimiento judicial de que el Partido Independentista Puertorriqueño y sus seguidores, como lo son los demandantes y la compareciente, continuamente han expresado que no le reconocen jurisdicción en Puerto Rico al Tribunal Federal.**

5. **La consecuencia lógica de esta situación es que este es el único foro donde estos electores pueden recurrir para proteger el voto que emitieron el pasado 2 de noviembre.**

6. **Partiendo de la premisa de que el Presidente de la CEE, Hon. Aurelio Gracia estima en 28,000 los votos mixtos como lo que están aquí en controversia, si este Honorable Tribunal no asume jurisdicción, el resultado sería que no habría foro donde estos electores pudieran solicitar amparo ante el ataque colateral que está realizando al presente el Partido Nuevo Progresista contra estos electores en el Tribunal Federal.**

. . .

8. **La compareciente entiende que la controversia ante el Tribunal es estrictamente una de derecho, y puede ser resuelta por esta Curia sin tener que devolver el caso al TPI. La demanda tiene como anejos copia de el voto mixto en controversia, y tiene copia de la demanda**

enmendada que se está ventilando ante el Tribunal Federal para el Distrito de Puerto Rico la cual crea el caso y controversia requerido para que se emita la sentencia declaratoria solicitada ante el TPI. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958) De igual forma, se le ha dado oportunidad a ser oído a los demandados-recurridos. Por tanto, no hay impedimento legal o constitucional para que esta Curia resuelva la controversia planteada de si son o no son válidos los votos mixtos aquí en controversia.

9. Por último, la compareciente hace eco de la posición esbozada por los demandantes en su Petición de Certificación, a los efectos de que su intención al votar bajo la insignia del PIP era la de mantener la franquicia electoral de este partido, mientras votaba a favor de Anibal Acevedo Vilá para gobernador, y Roberto Prats para Comisionado Residente.

POR TODO LO CUAL, muy respetuosamente se solicita de este Honorable Tribunal que expida el auto solicitado, y resuelva que los votos objeto de esta controversia son válidos. **Se solicita además que se le ordene a la CEE que termine el escrutinio, y de ser necesario, el recuento para el 22 de diciembre de 2004.** De igual forma se solicita que una vez concluya con esta gestión, haga la certificación del ganador para la gobernación que corresponda, de manera que para el inicio de la sesión legislativa, ya el gobernador electo este juramentado. (Énfasis suplido).

**El 20 de noviembre de 2004 a la una y cuarenta y cinco de la tarde (1:45 p.m.) se presentó ante nos "Moción de Intervención" por el Lcdo. Efraím Cintrón García para que se le incluyera como parte de los demandantes de autos** y "se le permita comparecer como su propia representación legal en su propia defensa y gozar de su derecho a presentar prueba a su favor y carearse y contrainterrogar a la parte demandada recurrida". Solicitó sumarse a las alegaciones de los demandantes de autos.

**El 20 de noviembre de 2004 a las cuatro y diez y seis minutos de la tarde (4:16 p.m.) presentó ante nos otro escrito la demandante recurrida, señora Marta Font, titulado "Moción Solicitando Adjudicación Urgente del Caso".** Argumentó, en su escrito, lo siguiente:

1. En la tarde de hoy, recibimos notificación de que el Comisionado Electoral del Partido Nuevo Progresista, Thomas Rivera Schatz, había presentado una "Notificación de Traslado" del caso de marras al Tribunal Federal. Por medio de este escrito, solicitamos que ha pesar de que se ha presentado esta petición a todas luces frívola al Tribunal Federal, esta Curia resuelva la controversia de autos a la brevedad posible, y que se de como no presentada la petición de traslado, por las razones que informamos a continuación.

2. De entrada, es totalmente falso que la demanda en el caso de autos trate de derechos federales bajo la Constitución de los Estados Unidos y/o leyes federales, como se alega en el ¶ 7 de la petición, a la página 2. Al contrario, siendo **<u>independentistas</u>** los demandantes y la interventora, deliberadamente se ha invocado sola y exclusivamente derechos bajos la Constitución del E.L.A. y la Ley Electoral del E.L.A. porque para dilucidar esta controversia, ninguno de los demandantes reconoce la jurisdicción sobre la materia del Tribunal Federal.

3. Aunque no debería sorprendernos las alegaciones jurisdiccionales falsas del Comisionado y compañero abogado Rivera Schatz, tenemos que informarle a esta Curia que precisamente ante el TPI, los demandantes y la interventora hicieron claro, en presencia de los abogados que firmaron la **Moción de Traslado** que se ha presentado en autos, que los demandantes y la compareciente no le reconocían la jurisdicción del Tribunal Federal en Puerto Rico, y que era por esta razón que no comparecían al Tribunal Federal para vindicar sus derechos al voto.

4. Resaltamos el hecho de que el Comisionado Rivera Schatz reconoce la falsedad de sus alegaciones jurisdiccionales falsas en su petición de traslado, ya

que en el ¶8 de su petición, página 2, reconoce que las alegaciones de la demanda son estrictamente estatales, cuando reza "[I]n their Complaint, the Jiménez[15] protest a violation of their constitutional right to vote, a right the **attempt** to base entirely on the due process ritht and equal protection clauses of the Puerto Rico Constitution. The Jimenez artful pleading, however, cannot conceal the essentially federal nature of thei claims." [Enfasis suplido.]

5. Como vemos, para obtener jurisdicción sobre la materia, el Comisionado Rivera Schatz se ve obligado a presentar alegaciones falsas ante el Tribunal Federal para que ejerza una jurisdicción que no existe, y para ello, recurre a re-escribir las alegaciones de la demanda y decir que donde dice noche, en verdad dice día.

6. Las alegaciones de Rivera Schatz en su *Notificación de traslado*, por vía de su exhibit, la Notificación de traslado que presentó en el Tribunal Federal, es igualmente capciosa e intencionada a inducir a error al tribunal federal, por omitir convenientemente que los Tribunales Federales apelativos, en particular, el Primer Circuito en Boston, han resuelto que cuestiones electorales deben resolverse primero en los tribunales estatales. Vease, a manera de ejemplo, los casos Bonas v. Town of North Smithfiel, 265 F 3rd 69, 74 (1st Cir.), Griffin v. Burns, 570 F. 2d 1065, 1076 (1sr Cir. 1978); Granados Navedo v. Acevedo, 703 S. Supp. 170, 175 D.P.R. 1988); Bennet v. Yhoshina, 140 F 3rd 1218, 1226 (9th Cir. 1998) (citando otros casos). Vease además los casos citados federales citados en **PSP v. CEE**, 110 DPR 400 (1980).

7. A la luz de lo anterior entendemos que el Tribunal Federal no tiene jurisdicción sobre la materia para pedir que proceda el traslado del caso de marras a dicho foro, y que lo que pretende el Comisionado Rivera Schatz con dicho traslado es tornar académico esta controversia amarrando el caso en el Tribunal Federal hasta el 2 de enero, fecha en que debe

---

[15] Cuestionamos que el bufete Martínez, Odel & Calabria sea quien redactó esta Notificación de traslado, ya que se hace el mismo error que cometen usualmente los norteamericanos, cuando confunden el apellido de la madre con el del padre. Nótese que la notificación usa el apellido *Jiménez* en vez de *Suárez* o *Suárez Jiménez*.

juramentar el gobernador electo. De esta forma, se le da oportunidad al Tribunal Federal a invalidar los votos mixtos objeto de esta controversia, o en la alternativa, posponer la resolución de la controversia aquí planteada para que la Asamblea Legislativa puede invocar el Art. IV, §9 de la Constitución del E.L.A., y de esta forma, ser la legislatura quien seleccione el gobernador.

POR TODO LO CUAL, muy respetuosamente se solicita de este Tribunal que determine que al haber ausencia de jurisdicción sobre la materia del Tribunal Federal, por ser esta controversia estrictamente fundamentada bajo la Constitución del Estado Libre Asociado de Puerto Rico y sus leyes, no hay razón legal ni jurisdiccional que impida que esta Honorable Curia expida el auto de Certificación, y resuelva la controversia aquí planteada.

De igual forma, habiendo optado el Comisionado Electoral Rivera Schatz a presentar su oposición a la Petición de Certificación con su Moción de traslado al Tribunal Federal, se solicita que se considere cumplida la obligación de este Honorable Curia a darle oportunidad a dicha parte a ser oído , y prosiga con los procedimientos conforme derecho.

II


## FORMA REPUBLICANA DE GOBIERNO

El Artículo I, Sección 2 de la Constitución de Puerto Rico[16] dispone lo siguiente:

### Forma de gobierno

El gobierno del Estado Libre Asociado de Puerto Rico **tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución,** estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico. (Énfasis suplido).

---

[16] Constitución del E.L.A., L.P.R.A. Tomo 1, ed. 1999, pág. 256.

El Artículo III, Sección 1 de la Constitución de Puerto Rico[17]

dispone lo siguiente:

**Asamblea Legislativa**

El **Poder Legislativo** se ejercerá por una Asamblea Legislativa, que se compondrá de dos Cámaras–el Senado y la Cámara de Representantes–cuyos miembros serán elegidos por votación directa en cada elección general. (Énfasis suplido).

El Artículo IV, Sección 1 de la Constitución de Puerto Rico[18]

dispone lo siguiente:

**Gobernador**

El **Poder Ejecutivo** se ejercerá por un Gobernador, quien será elegido por voto directo en cada elección general. (Énfasis suplido).

El Artículo V, Sección 1 de la Constitución de Puerto

Rico[19] dispone lo siguiente:

**Poder judicial; Tribunal Supremo; otros tribunales**

El **Poder Judicial** de Puerto Rico se ejercerá por un Tribunal Supremo, y por aquellos otros tribunales que se establezcan por ley. (Énfasis suplido).

La Convención Constituyente de Puerto Rico se inspiró

---

[17] Íd., pág. 365.

[18] Íd., pág. 384.

[19] Íd., pág. 393.

durante el proceso de redacción de nuestra Constitución en los principios de la Constitución de Estados Unidos. Surge de su diario de sesiones lo siguiente:

> Nuestra Constitución debe expresar nuestro entendido de la democracia, coincidente con el desarrollo histórico de este sistema de vida y gobierno en los más avanzados países de Occidente.
>
> ... *que consideramos factores determinantes en nuestra vida colectiva nuestra adhesión a los principios de la Constitución de los Estados Unidos, de cuya ciudadanía estamos investidos;...*
>
> **Nuestra constitución debe expresar nuestro entendido de la democracia, de los Estados Unidos. Nuestra constitución y nuestras leyes se inspiran en los principios de la Constitución federal, a la que hemos jurado colectivamente fidelidad y respeto al recibir y aceptar la ciudadanía americana.**[20] (Énfasis suplido).

La limitación del poder político constituye un principio, desarrollado por la teoría política liberal. Su instrumento fundamental es la distribución del poder. **La libertad es el resultado de la efectiva limitación del poder gubernamental sobre el individuo mediante un sistema donde "el poder frene al poder".** Por ello es necesario distribuir el poder entre diversos organismos de gobierno que se sirven mutuamente de contrapesos **evitando de esa forma la concentración de poder gubernamental que pueda poner en peligro precisamente la libertad individual.**[21] **La**

---

[20] 4 Diario de Sesiones de la Convención 2557 (1961).

CT-04-004

**organización interna de nuestro gobierno mediante la aprobación de nuestra Constitución está estructurada sobre una división tripartita de los poderes gubernamentales, cuyo fin principal es, en síntesis, asegurar la libertad del individuo contra la opresión del gobierno. El principio de la separación de poderes se adoptó por nuestra Asamblea Constituyente con el fin de impedir que se ejercitara un poder arbitrario.** No creemos que tuvo el propósito de evitar las fricciones, **pero sí salvar al pueblo de la autocracia,** disponiendo la forma de resolver las controversias emergentes de la fricción inevitable e incidental a la distribución de los poderes gubernamentales entre las tres ramas de gobierno.

Unos años antes de la aprobación y vigencia de la Constitución de Puerto Rico expresamos en <u>Banco Popular, Liquidador v. Corte</u>[22] lo siguiente:

> No se puede negar que el amplio principio de la separación de poderes ha sido un factor vital en la conservación de nuestras libertades desde su adopción por los Padres de la Patria (Founding Fathers). Pero algunas veces han surgido dificultades debido a la confusión de pensamiento en cuanto a dos problemas causados por el hecho de la existencia de ramas gubernamentales separadas pero de igual calibre.
>
> **En primer lugar, muchos han pasado por alto el hecho de que la separación absoluta nunca ha existido y nunca se pretendió que**

---

[21] R. Serrano Geyls, <u>Derecho Constitucional de Estados Unidos y Puerto Rico</u>, San Juan, Universidad Interamericana de Puerto Rico, 1997, Vol. I, pág. 571.

[22] 63 D.P.R. 66, 71-72 **(1944)**.

**existiera.** En verdad, Madison escribió en El Federalista que algunos se oponían a la Constitución por la única razón de que no disponía para una verdadera separación de poderes. Pero, como observó Madison, la frase "separación de poderes" es cierta sólo en parte. Nunca se pretendió que cada una de las ramas gubernamentales funcionara en un vacío, completamente independiente y alejada de las otras. **Más bien lo que la Constitución protegía fué [sic] descrito como sigue: "La acumulación de *todos* los poderes, legislativo, ejecutivo y judicial, en las *mismas* manos, bien de una, algunas o muchas personas, y ya sea por herencia, nombramiento propio o electivo, puede declararse con razón que es la definición exacta de la tiranía."** .(El Federalista (editado por Lodge), pág. 300- bastardillas nuestras.) **En verdad se ha sugerido que la confusión engendrada por el uso de la frase "separación de poderes," puede disiparse describiendo el principio como la "separación de funciones últimas".** (Herwitz y Mulligan, The Legislative Investigating Committee, 33 Col. L. Rev. 1,7.) Sea ello como fuere, **a los tribunales les concierne más el significado legal y de hecho del principio en vez de una selección entre breves descripciones competidoras.** Y no se puede afirmar con demasiado énfasis que las ramas gubernamentales están tan interrelacionadas en sus funciones como son independientes entre sí. **En la frase de Madison, los poderes gubernamentales han sido mezclados en vez de separarse. Sostenía que se exigía solamente un grado de separación y que este grado sólo se podía asegurar relacionando y mezclando las ramas. Beard, en La República, pág. 190, describe la intervención y balance (*checks and balances*) que de ello resulta como una clase de equilibrio dinámico.** (Énfasis suplido).

En <u>Hernández Agosto v. López Nieves</u>[23] expresamos lo siguiente:

No es hasta 1952 que se consagra formalmente en la Constitución del Estado

---

[23] 114 D.P.R. 601, 619-620 (1983).

CT-04-004

Libre Asociado (Art. I, Sec. 2) la existencia de tres poderes, subordinados todos por igual a la soberanía del Pueblo de Puerto Rico. **"Separación de poderes"**, explicaba el Lic. Víctor Gutiérrez Franqui en la Asamblea Constituyente, **al rechazar la insinuación de que una rama del gobierno podría predominar sobre las otras en toda circunstancia, "es que cada rama del gobierno se ajuste a bregar con aquellos aspectos de la organización política que son de su incumbencia"**. 1 *Diario de Sesiones de la Convención Constituyente* 591 (1951). **El énfasis recayó, como es natural, en la separación, mas no en la independencia absoluta de los poderes entre sí. Lo segundo hubiese creado tres departamentos estancos, con libertad cada cual, por ejemplo, para interpretar a su modo la Constitución del país. El concepto de la independencia absoluta, sin más, es claramente antagónico al sistema de pesos y contrapesos que ilustra la Constitución de Estados Unidos.** Una enmienda propuesta para que la Constitución del Estado Libre Asociado exigiese tal independencia absoluta fue derrotada sin mayor discusión. 3 *Diario de Sesiones de la Convención Constituyente* 1918–1919 (1952).

La naturaleza e importancia de la doctrina de la separación de poderes ha sido objeto de análisis por este Tribunal o varios de sus miembros en distintas ocasiones. *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); *In re Rodríguez Torres,* 106 D.P.R. 698, 700 (1978); *P.P.D. v. Ferré, Gobernador*, 98 D.P.R. 338,429 (1970); *Banco Popular, Liquidador v. Corte*, 63 D.P.R. 66 (1944).

Las facultades delegadas por el pueblo al Gobierno, en virtud del principio de separación de poderes contenido en la Constitución de Puerto Rico, se distribuyen entre las tres (3) ramas: la Judicial, le Ejecutiva y la Legislativa. Con este principio se persigue evitar la concentración de poderes en una sola rama de gobierno, o el abuso de poder por parte de una de

ellas; establecer un sistema de pesos y contra pesos que mantenga el equilibrio en el manejo del poder y asegurar una eficiente interacción entre las tres ramas gubernamentales.[24] El principio aludido no implica que las diferentes ramas del Gobierno deban mantenerse absolutamente separadas en todo momento ni que funcionen en "el vacío independientemente de las otras".[25] Puede existir un grado de interrelación entre ellas, siempre y cuando se mantenga íntegra la autoridad de cada una de ellas. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Para ello la relación entre los poderes del Gobierno debe ser dinámica y armoniosa.[26]

## JUSTICIABILIDAD

**Como paso previo a cualquier análisis de los méritos del presente recurso de certificación, sobre la base del derecho constitucional puertorriqueño, debemos analizar lo planteado ante el Tribunal de Primera Instancia y este Tribunal a la luz del principio de justiciabilidad, en cuanto a las doctrinas de legitimación activa, de academicidad y de revisión judicial. Este asunto es inherente al ejercicio de los poderes conferidos al**

---

[24] Sánchez v. Secretario de Justicia res. el 28 de junio de 2002, 2002 T.S.P.R. 98, 157 D.P.R.___, (2002) J.T.S. 105; Pueblo v. Santiago Feliciano 139 D.P.R. 360, 419-420 (1995); Noriega v. Hernández Colón, 135 D.P.R. 406 (1994); P.I.P. v. C.E.E., 120 D.P.R. 580, 611 (1988); Silva v. Hernández Agosto, 118 D.P.R. 45, 47 (1986).

[25] Pueblo v. Santiago Feliciano, *supra*; Noriega v. Hernández, Colón, *supra*.

[26] Pueblo v. Santiago Feliciano, *supra*, pág.420; Silva v. Hernández Agosto, *supra*, pág. 47.

**Poder Judicial, dentro del sistema republicano de gobierno contenido, en la Constitución de Puerto Rico.** La autoridad para evaluar y analizar los aspectos relacionados a la justiciabilidad de las causas, nace del elemental principio de que los tribunales existen únicamente para resolver **"casos y controversias"** genuinos surgidos entre partes opuestas, que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas.[27] **Los tribunales nos imponemos las limitaciones que emanan de estas doctrinas para, entre otras cosas, observar y garantizar el justo balance que se requiere de las distintas ramas de gobierno en la administración de la cosa pública. El análisis de este principio es, por lo tanto, un imperativo necesario dentro de nuestro sistema de separación de poderes. Las limitaciones que surgen del mismo imponen un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que, de otro modo, constituiría una clara amenaza para la calidad democrática del sistema.[28]**

**La aplicación de las diversas doctrinas que dan vida al principio de justiciabilidad determinan la jurisdicción de los tribunales, particularmente con relación a las controversias que se le presentan, al amparo de los derechos que garantiza nuestra Constitución y la democracia que instrumenta. Se trata, pues de una cuestión de umbral que debemos analizar ante el asunto que nos ocupa.**

---

[27] E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559 (1958).
[28] Íd., a la pág. 597.

**LEGITIMACIÓN ACTIVA**

La capacidad de una parte para realizar con eficacia actos procesales como parte litigante y comparecer como demandante o demandado, o en representación de cualquiera de ellos, se conoce propiamente como " legitimación en causa". Se requiere legitimación activa para ser demandante y pasiva para ser demandado.[29]

La persona que pretende ser parte ha de tener una capacidad individualizada y concreta en su reclamación ante los tribunales. Para que haya "acción legitimada" tiene siempre que existir la "capacidad para demandar". No obstante, no todo el que tiene "capacidad para demandar", tiene "acción legitimada" en un pleito específico. En cada pleito, además de "capacidad para demandar", la parte interesada deberá demostrar que tiene un "interés legítimo".[30]

La legitimación activa es un instrumento de autolimitación y de prudencia judicial que tiene su génesis en la doctrina de la justiciabilidad de las controversias.[31]

**La doctrina mediante la cual se ausculta la legitimación activa de un reclamante ha sido sostenida por nuestra jurisdicción**

---

[29] L. Ribó Durán, Diccionario de Derecho, Barcelona, Ed. Bosch, 1987, pág. 364.

[30] E. Serrano Geyls, op. cit., pág. 132: Col. Ópticos v. Vani Visual Center, supra.

[31] Íd., E.L.A. v. Aguayo, supra.

**como uno de los ingredientes necesarios para establecer la jurisdicción de los tribunales, en consideración a principios de justiciabilidad. Tiene legitimación activa una parte que cumple con los siguientes requisitos: (1) la parte que reclama deber haber sufrido un daño claro y palpable: (2) el daño debe ser real, inmediato y preciso, no abstracto o hipotético; (3) debe existir una relación causal razonable entre la acción que se ejecuta y el daño alegado; (4) la causa de acción debe surgir al amparo de la Constitución o de alguna ley.[32]**

## OPINIÓN CONSULTIVA

En Ortiz Rivera v. F.E.I.[33] expresamos lo siguiente:

El concepto de "*opinión consultiva*", que es de estirpe constitucional, se define como la ponencia legal emitida por un tribunal **cuando no tiene ante sí un caso o una controversia justiciable,** y cuyo resultado, por tanto, no es obligatorio, *Black's Law Dictionary*, pág. 1119 (7ma edición 1999). La doctrina de opinión consultiva es integral al concepto constitucional de "*justiciabilidad*" que rige en nuestra jurisdicción, el cual establece como requisito la existencia de un caso o controversia real para el ejercicio válido del poder judicial.

**La doctrina de opinión consultiva intenta evitar que se produzcan decisiones en el vacío, en el abstracto, o bajo hipótesis de índole especulativa, ya que no es función de los tribunales actuar como asesores o consejeros.** *Com. de la Mujer v. Srio de Justicia*, 109 D.P.R. 715, 721 (1980); *E.L.A. v. Aguayo*, 80 D.P.R. 552,

---

[32] García Oyola v. J.C.A., 142 D.P.R. 532 (1997); P.P.D. v. Rosselló González, 139 D.P.R. 643 (1995).

[33] Ortiz v. Panel F.E.I., 155 D.P.R. ___ (2001), 137 J.T.S., res. el 8 de octubre de 2001, 2001 T.S.P.R. 134.

**558–560 (1968).** En fin, a los tribunales les está vedado emitir opiniones consultivas sujetas a revisión e interpretación por las otras ramas de gobierno. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Vol. I, pág. 116 (1986).

En cambio, el concepto de *obiter dictum* aplica cuando un tribunal emite expresiones innecesarias **en un caso o una controversia ante sí,** y acerca de interrogantes jurídicas que, propiamente, no le han sido planteadas. *Black's Law Dictionary, op. cit.*, pág. 1100. Tratándose de expresiones no directamente relacionadas con la controversia planteada, éstas no sientan precedente jurídico alguno. *Martínez v. Registrador*, 54 D.P.R. 7 (1938); *Ponce & Guayama Railroad Co. v. Antonetti*, 17 D.P.R. 352 (1911).

Por sus propios términos, la doctrina constitucional de *"opinión consultiva"* es de aplicación sólo cuando el asunto sobre el cual un tribunal se expresó **no** cumplía con el requisito constitucional de *"justiciabilidad"*, **es decir, no se trataba propiamente de un "caso" o una "controversia".** Los tribunales deben estar atentos de que los asuntos ante su consideración sean justiciables. De lo contrario, procede desestimar, sin mayor explicación. (Énfasis suplido).

## LEY PUBLICA 447

La Ley Pública 447[34] aprobada por el Congreso 82$^{do}$ de Estados Unidos dispone lo siguiente:

> **Joint Resolution approving the constitution [sic] of the Commonwealth of Puerto Rico** [sic] which was adopted by the people of Puerto Rico on March 3, 1952.
>
> WHEREAS the Act entitled "An Act to provide for the organization of a constitutional government by the people [sic] of Puerto Rico", approved July 3, 1950, was adopted by the Congress as a compact with the people [sic] of Puerto Rico, to become operative upon its approval by the people [sic] of Puerto Rico; and

---

[34] 1 L.P.R.A. sec. 8.

WHEREAS the people [sic] of Puerto Rico overwhelmingly approved such Act in a referendum held on June 4, 1951, and a constitution for the Commonwealth of Puerto Rico was drafted by a constitutional convention held as provided by such Act from September 17, 1951, to February 6, 1952; and

WHEREAS such constitution was adopted by the people of Puerto Rico, by a vote of three hundred seventy-four thousand six hundred and in a referendum held on March 3, 1952; and

WHEREAS the President of the United States has declared that the constitution [sic] of the Commonwealth of Puerto Rico conforms fully with the applicable provisions of such Act of July 3, 1950, and of the Constitution of the United States, **that it contains a bill of rights, and provides for a republican form of government, and has transmitted the constitution [sic] of the Commonwealth of Puerto Rico to the Congress for its approval;** and

WHEREAS **the Congress has considered the constitution [sic] of the Commonwealth of Puerto Rico and has found it duly to conform to the above requirements:** Therefore be it

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That:

The constitution [sic] of the Commonwealth of Puerto Rico which was drafted by the selected delegates to the Constitutional Convention of Puerto Rico and adopted by the people [sic] of Puerto Rico in a referendum of March 3, 1952, in accordance with the Act entitled "An Act to provide for the organization of a constitutional government by the people of Puerto Rico", approved July 3, 1950 (64

CT-04-004

Stat. 319; 48 U.S.C., secs. 731b–731e),[35] is hereby approved by the Congress of the United States, except section 20 of article II of said constitution: *Provided*, That section 5 of article II thereof shall have no force and effect until amended by the people [sic] of Puerto Rico under the procedure prescribed by article VII of the constitution [sic] of the Commonwealth of Puerto Rico by adding to such section 5 the following declaration: "Compulsory attendance at elementary public schools to the extent permitted by the facilities of the state as herein provided shall not be construed as applicable to those who receive elementary education in schools established under nongovernmental auspices": *Provided further*, That except for the purpose of adopting the amendments to section 5 of article II and to section 3 of article VII as herein provided, article VII of said constitution likewise shall have no force and effect until amended by the people of Puerto Rico under the terms of said article by adding to section 3 of article VII the following new sentence: "Any amendment or revision of this constitution shall be consistent with the resolution enacted by the Congress of the United States approving this constitution, with the applicable provisions of the Constitution of the United States, with the Puerto Rican Federal Relations Act, and with Public Law 600, Eighty-first Congress, adopted in the nature of a compact": ***And provided further***, **That the constitution [sic] of the Commonwealth of Puerto Rico hereby approved shall become effective when the Constitutional Convention of Puerto Rico shall have declared in a formal resolution its acceptance in the name of the people of Puerto Rico of the conditions of approval herein contained**, and when the Governor of Puerto Rico, being duly notified by the proper officials of the Constitutional Convention of Puerto Rico that such resolution of acceptance has been formally adopted, shall issue a proclamation to that effect. Approved July 3, 1952. (Énfasis suplido).

De las alegaciones de los demandantes ante el Tribunal de Primera Instancia y aquí peticionarios se desprende en forma

---

[35] 48 U.S.C.A §§ 731b-731e. U.S. Cong & Adm. News ´52-da.

diáfanamente clara que no exponen la existencia de un daño inmediato, claro, palpable, real, preciso y concreto sufrido por ellos, por lo que no tienen legitimación activa para presentar una acción de sentencia declaratoria ante el Tribunal de Primera Instancia. El referido daño no puede ser abstracto, hipotético o especulativo. La Comisión Estatal de Elecciones tomó una determinación favorable a los aquí peticionarios a los efectos de que se contaran sus votos como mixtos, imprimiéndole el valor y significado a todas las marcas, que estos admiten en su escrito ante este Tribunal, hicieron en la papeleta. Dicha determinación de la Comisión Estatal de Elecciones como organismo con autoridad, competencia y jurisdicción sobre ese asunto está cobijada bajo la presunción de legalidad y corrección y le es favorable a los aquí peticionarios. Por lo que éstos **no tienen "caso y controversia"** alguno que presentar ante el Tribunal de Primera Instancia mediante demanda de sentencia declaratoria, pues no han sido afectados por la determinación de la Comisión Estatal de Elecciones ni tampoco existe un estado de derecho que delimitar a través de ese recurso procesal, sobre el alcance y valor de su voto, emitido el pasado 2 de noviembre de 2004, pues dicho organismo le imprimió el significado pretendido por los aquí peticionarios. El Tribunal de Primera Instancia y este Tribunal no tuvieron ante si un asunto justiciable pues no fue presentado por los demandantes de autos y aquí peticionarios un **"caso y controversia."**

Los peticionarios alegaron que estando pendiente ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico, al momento de presentarse el recurso de certificación en este Tribunal, una acción donde se cuestionó la validez constitucional de las normas y su aplicación sobre el valor y significado de determinados votos mixtos, la validez de su voto **pudo** verse afectada por una decisión de ese Tribunal. Por ello entendieron y efectivamente alegaron que el Tribunal de Primera Instancia de Puerto Rico y este Tribunal, foros donde no se rebatió en forma alguna la presunción de legalidad y corrección de la determinación de la Comisión Estatal de Elecciones por las partes adversamente afectadas, tiene jurisdicción para resolver lo que nunca se le planteó por esas partes. Concluimos que si los peticionarios entendieron que el tribunal federal **pudo** afectar la presunción de  legalidad y corrección que cobija la determinación de la Comisión Estatal de Elecciones, que les favorecía en cuanto al valor y significado de sus votos, el único recurso con que contaban era intervenir en el proceso pendiente ante ese foro. No lo hicieron. No constituye fundamento de derecho válido para que éste Tribunal asuma jurisdicción que alguna de las partes tenga como posición o criterio ideológico no reconocer la autoridad y jurisdicción de los tribunales federales sobre algún asunto o controversia trabado entre ciudadanos de Estados Unidos residentes en Puerto Rico y su gobierno.

El Comisionado Electoral del Partido Popular Democrático pretendió de este Tribunal, y así efectiva y expresamente solicitó su intervención, bajo el fundamento que el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico **pudo** asumir jurisdicción sobre la base de la declaración de un testigo presentado por la parte allí demandante durante la celebración de una vista evidenciaría y **pudo** haber interpretado la Ley Electoral de Puerto Rico y su Reglamento. No obstante, ignoró y soslayó los principios de derecho constitucional puertorriqueño relacionados con los principios de justicialidad de los asuntos sometidos a los tribunales de Puerto Rico, de legitimación activa y de revisión judicial. Estos principios contenidos en la Constitución de Puerto Rico regulan la intervención y jurisdicción del Tribunal General de Justicia de Puerto Rico, incluso de este Tribunal. Conducta similar observó la Comisión Estatal de Elecciones.

No existe para el que suscribe duda alguna al examinar los escritos presentados por algunos demandantes de autos y aquí peticionarios y los presentados por algunos demandados de autos, aquí recurridos de la presencia de una colusión entre ellos para someter a la atención de este Tribunal este asunto, en primera instancia y en jurisdicción original, en desafío al derecho constitucional puertorriqueño. Al acoger la Mayoría tal pretensión y tomar tal curso de acción participan en la gestación de un monstruoso engendro, constitutivo de un acto de desobediencia civil.

Este Tribunal, a pesar de su nombre (Tribunal Supremo), no tiene autoridad para imprimirle a sus facultades una dimensión que la Constitución de Puerto Rico no le ha otorgado. El Tribunal de Primera Instancia y este Tribunal sólo pueden emitir decisiones vinculantes para las partes que acuden ante si cuando se le presenta un **"caso y controversia"** y tiene jurisdicción para así hacerlo. Concluimos que el asunto ante nos no es uno justiciable porque los demandantes de autos, aquí peticionarios, no tienen legitimación activa para promover su pleito y no han presentado un **"caso y controversia"** ante el Tribunal de Primera Instancia y este Tribunal. Este Tribunal carece de jurisdicción para actuar bajo el derecho constitucional puertorriqueño. Concluimos, además, que los peticionarios pretendieron de este Tribunal la emisión de una **opinión consultiva** que les favoreciera, a lo cual accedió la Mayoría en completo y absoluto menosprecio a los principios constitucionales puertorriqueños antes mencionados. La actuación altamente irregular y apresurada de la Mayoría en este asunto privó de legitimidad a este Tribunal, pues a tenor con nuestro derecho constitucional, no resulta vinculante su decisión, además, de restarle confiabilidad y credibilidad ante la ciudadanía.

La Mayoría violó claramente la forma republicana de gobierno dispuesta en la Constitución de Puerto Rico lesionando seriamente nuestro sistema democrático de gobierno. Violó, además, las condiciones y requisitos impuestos por el Congreso de Estados Unidos para emitir la Ley Pública 447, supra, para aprobar y

determinar la vigencia de la Constitución de Puerto Rico, consistente en que los puertorriqueños vivieran bajo una forma republicana de gobierno garantizada por ese documento. Al optar la Mayoría por el curso de acción tomado ejerció un poder absoluto en violación directa de las referidas condiciones y requisitos que dispuso el Congreso de Estados Unidos para la aprobación de la Constitución de Puerto Rico. Ejerció, además, ese poder en forma arbitraria, pues violó la garantía constitucional a un debido proceso de ley de la parte demandada recurrida. La actuación de la Mayoría redujo a cenizas el propósito de la forma republicana de gobierno de nuestra constitución, **"asegurar la libertad del individuo frente a la opresión del gobierno"**.

## III

Por todo lo antes expuesto **DISIENTO** en forma vehemente nuevamente y desde los más profundo de mi ánimo y espíritu de lo actuado por la Mayoría en este asunto.


Efraín E. Rivera Pérez
Juez Asociado